1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 08-CR-00938-LHK |
| Plaintiff, | ) ) ) | |
| v. | ) ) | ORDER DENYING DEFENDANT JAMIE HARMON'S MOTION FOR A NEW TRIAL |
| JAMIE HARMON, | ) ) ) | [PUBLIC REDACTED VERSION] |
| Defendant. | ) ) | |

Before the Court is a motion by Defendant Jamie Harmon ("Harmon") for a new trial based on alleged *Brady* violations. The government opposes the motion. Having considered the submissions of the parties, the record, and the relevant law, the Court hereby DENIES Harmon's motion for a new trial.

I.      PROCEDURAL HISTORY

On December 31, 2008, a grand jury indicted Harmon for money laundering and conspiracy to commit money laundering. ECF No. 1. The Indictment alleged that Harmon, an attorney, used her attorney-client trust account to conceal the illicit origin of funds Harmon knew were derived from unlawful activity committed by one of her clients, Christian Pantages ("Pantages"). One of Pantages' accomplices, Yan Ebyam ("Ebyam"), testified against Harmon before the grand jury. In preparation for trial, the government filed an initial witness list which

1

United States District Court
For the Northern District of California

1    included Ebyam. ECF No. 71. However, as trial approached, the government filed updated witness

2    lists with Ebyam's name removed. ECF Nos. 95, 115.

3            Harmon's trial took place in July of 2010. On July 5, 2010, immediately prior to trial,

4    Harmon filed a witness list which included Ebyam, specifying that the purpose for calling him was

5    "impeachment." ECF No. 121. In response, on July 12, just one day before the government rested

6    its case in chief, the government filed a motion for an *ex parte* hearing. ECF No. 133. The purpose

7    of the motion and hearing was to disclose to Judge James Ware that starting in January 2008,

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████

11   ███████████████████████████████████. The government requested that

12   the court order that the information need not be disclosed to Harmon. *Id.* Judge Ware never ruled

13   on the government's motion, and the government did not disclose the information to Harmon.

14   Ebyam testified one day later, on July 13. *See* Reporter's Transcript 1246-1336 ("RT"). Though

15   Ebyam was called by the defense, he was declared a hostile witness and examined "As-on Cross"

16   by Harmon's counsel and "As-on Direct" by the government. *See* RT 1207.

17           On July 20, 2010, a jury found Harmon guilty of five counts of money laundering in

18   violation of 18 U.S.C. § 1956(A)(i)(b)(i), but hung regarding her guilt on one count of conspiracy

19   to commit money laundering in violation of 18 U.S.C. § 1956(h). ECF No. 146. After her

20   conviction, Harmon moved to dismiss the Indictment based on prosecutorial misconduct during the

21   grand jury proceedings by filing a motion for judgment of acquittal under Federal Rule of Criminal

22   Procedure 29, and in the alternative, a new trial under Federal Rule of Criminal Procedure 33. ECF

23   No. 175. The government opposed. ECF No. 183. On August 18, 2011, Judge Ware denied

24   Harmon's Rule 29 motion for acquittal and rejected Harmon's argument that an indictment based

25   upon knowingly perjured testimony violates due process. ECF No. 227 at 11. Judge Ware,

26   however, granted Harmon's motion for a new trial under Rule 33 based on an erroneous jury

27   instruction that Judge Ware identified sua sponte. ECF No. 227 at 17. The government

28   subsequently appealed Judge Ware's order granting a new trial. ECF No. 236.

United States District Court
For the Northern District of California

2

1  On August 13, 2013, the Ninth Circuit issued a memorandum disposition reversing Judge

2  Ware's grant of a new trial because "the instructional error would not have warranted a new trial

3  because it was harmless" in light of the overwhelming evidence of Harmon's guilt. ECF No. 308 at

4  3. The Ninth Circuit did not reach the issue of whether a new trial was warranted in light of any

5  prosecutorial misconduct during the grand jury proceedings. *See id.*

6  After Judge Ware's retirement, this case was reassigned to the undersigned judge on

7  September 5, 2012. ECF No. 278. On February 28, 2014, this Court denied Harmon's request for a

8  new trial based on allegations of petit juror misconduct. ECF No. 344. On May 31, 2014, this Court

9  denied Harmon's motion for new trial based on prosecutorial misconduct in which Harmon argued

10  that Ebyam's testimony before the grand jury was false. ECF No. 387.

11  Thereafter, Harmon filed the pending motion for new trial, based on the government's

12  alleged non-disclosure of *Brady* evidence. ("Mot'n"). On July 25, 2014, the government filed an

13  opposition. ("Opp'n"). On August 8, 2014, Harmon filed a reply. ("Reply").

14  ## II.    LEGAL STANDARD

15  Under *Brady v. Maryland*, the government must disclose evidence that is favorable to the

16  accused and material either to guilt or punishment. 373 U.S. 83, 87 (1963). There are three

17  components to a *Brady* violation: (1) "[t]he evidence at issue must be favorable to the accused,

18  either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been

19  suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued."

20  *United States v. Stinson*, 647 F.3d 1196, 1208 (9th Cir. 2011) (quoting *Strickler v. Greene*, 527

21  U.S. 263, 281-82 (1999)). "To determine whether prejudice exists, [courts] look to the materiality

22  of the suppressed evidence." *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008). Favorable

23  evidence is "material" if there is a reasonable probability that disclosure of the evidence would

24  have changed the outcome of the proceeding. *United States v. Bagley*, 473 U.S. 667, 682 (1985). A

25  "reasonable probability" under *Bagley* is "a probability sufficient to undermine the confidence in

26  the outcome." *Id.* at 678.

27  ## III.    FACTUAL HISTORY

28

3

United States District Court
For the Northern District of California

1    Before analyzing Harmon's motion, the Court sets forth the relevant facts elicited at

2    Harmon's trial. In late 2002, Christian Pantages and Yan Ebyam started a company called Silicon

3    Valley Resale ("SVR") in order to purchase and sell new and used computer equipment. RT 814,

4    817-19, 826. SVR initially purchased equipment exclusively from legitimate sources, but Pantages

5    and Ebyam began purchasing stolen equipment as well, creating false invoices in order to "reflect

6    any attention from the government." RT 842-43. This included a large amount of Cisco computer

7    equipment, stolen from the warehouse of a local trucking company, Watkins Trucking. RT 970-

8    975. SVR would remove the new Cisco equipment from the box and sell it to buyers around the

9    country as if it were used. *Id.*

10    Eventually, federal and local authorities became aware of the operation. In December 2003,

11    James Sibley ("Sibley"), a prosecutor at the Santa Clara County District Attorney's Office, filed a

12    criminal complaint against Pantages and Ebyam, and arrest warrants for both men were issued. RT

13    558-62. On Friday, December 19, 2003, Pantages was arrested by local police at a Bank of

14    America branch in Santa Clara, California. RT 875-76. Pantages was arrested with $110,000 in

15    cash that he had withdrawn in order to pay an associate for stolen merchandise. RT 881. SVR's

16    account at Bank of America was frozen. RT 945. Pantages was taken to the Detention Center in

17    Santa Clara County, where he called his then-wife Ingrid Harry Cortopassi ("Cortopassi"). RT 887.

18    Cortopassi hired Harmon, a defense attorney and former prosecutor, to represent Pantages. RT 887-

19    888, 924.

20    After Pantages was released from custody on December 23, 2003, Pantages and Cortopassi

21    went to a Federal Express box owned by SVR, where they were able to recover two cashier's

22    checks made out to SVR in the amount of $42,300 and $85,250 respectively. RT 950-951; Exs. 34,

23    35. These checks were from two of SVR's customers, TDC and Alta Tech, and were payment for

24    the delivery of Cisco equipment stolen from Watkins. RT 946:10-947:24. Pantages then went to a

25    Bank of America branch in order to have the checks converted into cashier's checks made out to

26    Pantages, but SVR's personal banker informed Pantages that while funds could be deposited into

27    SVR's accounts, they could not be transferred out, leading Pantages to conclude that SVR's

28    accounts had been frozen. RT 953-54. Shortly afterwards, Pantages and Cortopassi met with

4

United States District Court

For the Northern District of California

1   Harmon in her office to discuss the pending criminal charges against Pantages. RT 955:19-25.

2   Following that meeting, the TDC and Alta Tech checks were signed over from SVR to Harmon,

3   who deposited these two checks into a client trust account which she controlled. RT 964:14-

4   967:10, 1366:7-21; Exs. 34, 35. Between December 31, 2003 and January 29, 2004, Harmon's

5   client trust account issued a number of checks totaling more than $48,000 made payable to

6   Cortopassi.[1] Opp'n Ex. A (bank records slide in government presentation at trial). On February 4, a

7   final check from the trust account in the amount of $54,050 was issued to Christian Pantages. *Id*.

8   Harmon told Pantages that the remainder of the funds were to be used to pay Harmon for Pantages'

9   defense. RT 998-99.

10          At Harmon's trial, the illicit nature of the funds was not in serious dispute. Rather, the

11   crucial issue of fact was whether Harmon *knew* that the funds deposited into the trust account by

12   Harmon and dispersed to Cortopassi and Pantages were the proceeds of illegal activity. The

13   government offered witness testimony and documentary evidence demonstrating that Harmon was

14   aware that the TDC and Alta Tech checks came from the sale of stolen computer equipment, as

15   explained below.

16          *A. The Government's Case*

17          Christian Pantages testified against Harmon at trial. Pantages testified that he first met

18   Harmon on December 21, 2003, while he was still in custody following his arrest. RT 924:18-25.

19   Pantages testified that at this first meeting, he was entirely clear about the illegal nature of SVR's

20   business: "I talked about leaving [SVR] for a time and coming back; about Yan just taking the

21   business in a much more devious direction where our transactions were 100 percent based on

22   stolen computer hardware and we were doing no legitimate business. . . ." RT 930-931. Pantages

23   further testified that he told Harmon that "all of the deals" SVR did were based on the sale of

24   stolen computer equipment. RT 933:22-25.

25          Pantages testified that shortly after he was released from custody, on December 23, 2003,

26   he retrieved the TDC and Alta Tech checks. RT 950-951. Pantages testified that after trying and

27   _____

28   [1] The checks were made out to "Ingrid Harry," Ms. Cortopassi's maiden name and the name she was using in 2003, but in order to avoid confusion the Court will refer to Ms. Cortopassi exclusively by the name she used at trial and listed in the trial transcript.

Case No.: 08-CR-00938-LHK
ORDER DENYING DEFENDANT JAMIE HARMON'S MOTION FOR A NEW TRIAL

United States District Court
For the Northern District of California

1    failing to have Bank of America transfer the checks into his name, Pantages went to visit Harmon

2    at her office. RT 953-955. Pantages testified that he told Harmon that he thought his accounts had

3    been frozen, and that one of the purposes of the visit was determining if there was a way of

4    converting these checks (payable to SVR) into funds that he could use to pay for his defense. RT

5    960:4-12. Pantages told the jury that Harmon suggested depositing the two checks into her client

6    trust account, and then Harmon could return the proceeds to Pantages. RT 960, 966. In addition to

7    discussing how to deposit the checks, Pantages testified that Harmon and he further discussed the

8    illicit nature of SVR's business. RT 967:11-23. Specifically, Pantages told the jury that he "wanted

9    [his] attorney to know as much about it as possible so [Harmon] could be – prepare the best

10   defense she could." RT 968:1-3. Pantages testified that he told Harmon specifically about the

11   scheme to steal Cisco equipment from Watkins trucking, RT 971:24-972:16, and told Harmon that

12   SVR concealed the illicit nature of the goods by making the equipment look used before they sold

13   it. RT 973:23-975:21.

14          Pantages testified that at the end of the meeting with Harmon, he signed the checks over to

15   Harmon so that they could be deposited into her client trust account. RT 977:11-15. Pantages

16   testified that after he heard from Harmon that the checks had cleared, he requested $15,000. RT

17   986. Pantages and Harmon agreed that the check should be made out to Cortopassi in order to

18   make it less likely that the government would seize the funds, and Harmon wrote a $15,000 check

19   payable to Cortopassi from the client trust account. RT 987-88. On January 7, 2004, Pantages

20   requested and received $30,000 from Harmon, which was broken up into three separate $10,000

21   checks (again payable to Cortopassi) in order to avoid attention. RT 991-993. Finally, in February,

22   2004, Pantages received a single check in the amount of $54,050, made payable to Pantages. RT

23   999. Pantages testified that Harmon told him this amount represented the funds remaining in the

24   client trust account after subtracting Harmon's $7,500 fee for representing him.[2] RT 998-99.

25   Pantages testified that in response to his concerns about the large size of the check, Harmon told

26

27   _____

     [2] Of the $127,550 deposited into the trust account, Pantages and Cortapassi received a total of
28   $102,050 in disbursements. Harmon's fee of $7,500 leaves $18,000 unaccounted for by the
     explanation allegedly given to Pantages by Harmon. At trial, the government accused Harmon of
     using portions of those funds as a "personal piggy bank." *See* RT 1925; Opp'n, Exhibit A.

Case No.: 08-CR-00938-LHK
ORDER DENYING DEFENDANT JAMIE HARMON'S MOTION FOR A NEW TRIAL

United States District Court
For the Northern District of California

1  Pantages to take the check to Harmon's personal banker and have the check broken into cashier's

2  checks made payable to Cortopassi. RT 1001-02. Bank records corroborated Pantages' testimony,

3  showing payments made at the times and in the amounts Pantages testified. RT 987, 991, 1001.

4  James Sibley, the District Attorney responsible for the State prosecution against Pantages,

5  testified against Harmon as well. Sibley testified that he provided extensive discovery to Harmon,

6  detailing SVR's illegal activities. RT 563-567. Sibley also testified that he told Harmon personally

7  that Pantages and SVR were "major fences in Silicon Valley…" RT 577-579, 589.

8  Ingrid Cortopassi testified as well. Cortopassi testified that she met with Pantages and

9  Harmon at Harmon's office shortly after Pantages was released from custody, and testified that

10  Pantages brought the TDC and Alta Tech checks to the meeting. RT 718-723. Cortopassi testified

11  that Harmon "suggested [they] put the money into [Harmon's] client trust account because that

12  way the initial – the money would be safe and that would be the way that the retainer could be paid

13  for her services" for defending Pantages in his criminal case. RT 727:19-23. Cortopassi explained

14  that "safe" meant "that the government had not frozen the account." RT 728:3-5. Cortopassi

15  testified that she recalled receiving checks from Harmon in December 2003 and January 2004, that

16  the money came from Harmon's client trust account, and that the funds were from the two checks

17  "the originally were deposited into [Harmon's] client trust account when she started representing

18  Mr. Pantages." RT 734-736.

19  Finally, Ginger Wright ("Wright"), Harmon's office manager of three years, testified

20  against Harmon. Wright testified that she handled Harmon's client trust account, and explained that

21  the pattern of depositing a sum of money substantially larger than the fixed fee agreed on by the

22  client was highly unusual for Harmon. RT 774-775. Similarly, Wright testified that Harmon had

23  never disbursed the bulk of a client's funds back to the client within just a few weeks of receiving

24  them, had never issued three checks in identical amounts to a single client in just one day, and had

25  never returned such a large sum of money in such a short period of time (6 weeks). RT 780.

26  Though the government had relied extensively on Ebyam's testimony in front of the grand jury,

27  Ebyam did not testify during the government's case in chief.

28  *B. Defendant's Case*

7

1    Harmon's counsel began the defense case in chief by calling Yan Ebyam. Harmon

2    questioned Ebyam extensively on his cooperation with the government in Harmon's case, his prior

3    testimony in front of the grand jury, as well as the details of his plea agreement with the

4    government. RT 1261-1276.[3] At first, Ebyam stated he did not recall the specific details of his plea

5    agreement. RT 1265. Defense counsel confronted Ebyam with his plea agreement, drawing

6    particular attention to the requirement that Ebyam was obligated to continue cooperating with the

7    government both before and after his sentence. RT 1270:15-19. Defense counsel also emphasized

8    that the government had complete discretion to decide whether or not Ebyam had complied with

9    his obligations under the agreement. RT 1271:24-1273:3. Harmon's counsel also questioned

10   Ebyam about a previous incident of dishonesty in front of a court. RT 1297:24-1300:16. After

11   being arrested on the same charges as Pantages, a State court judge ordered Ebyam jailed for

12   contempt on the grounds that Ebyam had lied about certain aspects of his personal finances for the

13   purposes of requesting a public defender. RT 1299:24; 1300:14-15.

14       The government's examination, conducted "As-on Direct," focused almost exclusively on

15   conversations between Ebyam and Harmon which occurred shortly after the arrest of Christian

16   Pantages, attempting to show that prior to receiving the Alta Tech and TDC checks, Harmon was

17   aware that SVR engaged in sales of stolen computer equipment. RT 1323-1333. Ebyam testified

18   _____

19   [3] On September 27, 2004, Ebyam pleaded guilty in federal court to one count of conspiracy to
     commit money laundering in violation of 18 U.S.C. § 1956(h) pursuant to a plea agreement. ECF
20   No. 350–2 (Plea Agreement). In his plea agreement, Ebyam admitted that between September 1,
     2003 and December 31, 2003, he participated in a conspiracy to launder money. *Id.* at ¶ 1. In return
21   for Ebyam's plea, the government promised Ebyam "to move to dismiss any open charges," *id.* at ¶
     15, "not to file or seek any additional charges that could be filed as a result of the investigation that
22   led to the pending indictment," *id.* at ¶ 16, "not to use any statements made by the defendant [ ]
     against him," *id.* at ¶ 17, and to recommend a downward departure from the Sentencing Guidelines
23   based on Ebyam's cooperation, *id.* at ¶ 19. In return, Ebyam promised to "cooperate with the U.S.
     Attorney's Office before and after I am sentenced," including as follows: "I will respond truthfully
24   and completely to any and all questions put to me, whether in interviews, before a grand jury or at
     any trial or other proceeding; ... I will testify truthfully at any grand jury, court or other proceeding
25   as requested by the government." *Id.* at ¶ 9. If Ebyam breached the agreement, the government
     would be "released from all of its promises," and "any statements [he] made to any law
26   enforcement or other government agency or in Court, whether or not made pursuant to the
     cooperation provisions of this Agreement, may be used in any way," and any statute of limitations
27   defense would be waived, though Ebyam himself would "not be released from [his] guilty plea."
     *Id.* at ¶¶ 11–12.

28

8

United States District Court
For the Northern District of California

1    that he specifically told Harmon the Alta Tech and TDC checks were proceeds from the sale of

2    stolen computer equipment. RT 1332:17-20. Ebyam also testified that this testimony matched his

3    previous testimony in front of the grand jury, in which he testified that he told Harmon that SVR's

4    business was entirely the sale of stolen equipment. RT 1333:6-10. Defense counsel conducted a

5    brief re-cross, probing why Ebyam had so much difficulty remembering the answers to questions

6    posed by Harmon's counsel, while answering the government's questions with relative ease. RT

7    1333-1334.

8        After Ebyam testified, Harmon testified in her own defense, denying knowledge of the

9    illicit nature of the Alta Tech and TDC checks. RT 1337-1525; 1562-1692; 1744-1769. She

10   repeatedly testified that no one—neither Ebyam or Pantages—told her that the TDC and Alta Tech

11   checks were from stolen property, or that SVR was dealing in stolen property. RT 1365:3-9,

12   1467:13-18, 1477:8-78:9, 1490:10-16, 1755:25-56:5. In closing argument, defense counsel argued

13   that Ebyam and Pantages were unreliable, pointing to their cooperation agreements with the

14   government and alleged contradictions in their testimony. RT 1962-1971.

## IV.    ANALYSIS

16       Harmon asks this Court to grant a new trial, arguing that the government's failure to

17   disclose ████████████████████████████████████████ as required by *Brady* constitutes a

18   violation of Harmon's right to Due Process. Mot'n at 10:6-7. Harmon argues that although Ebyam

19   was called by the defense, "Ebyam was in effect a prosecution witness, not a defense witness."

20   Mot'n at 9:20-21. Harmon argues that Ebyam's testimony went to the key issue at dispute in

21   Harmon's trial—Harmon's knowledge of the illicit nature of SVR and the funds disbursed from the

22   client trust account—and argues that ████████████████████████ was critical to the jury's

23   evaluation of Ebyam's credibility. As a result, Harmon argues, the government failed in its

24   obligation to disclose evidence that is "favorable to the accused and material to guilt." *Brady*, 373

25   U.S. at 87.

26       The Ninth Circuit has not addressed the issue posed in the instant case: whether or not the

27   government is obligated to disclose under *Brady* impeachment evidence of a witness who is called

28   by the defense but testifies as a hostile witness by providing information substantially in favor of

the government.[4] The Court need not resolve that question in order to dispose of Harmon's motion. Because this area of law is unsettled, and because the instant motion can be resolved on other grounds, the Court declines to decide whether the government violated its *Brady* obligations. A "constitutional error" occurs only if the suppression of evidence "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. As discussed below, even assuming that the government was obligated to █████████████████████████████████████, Harmon was not prejudiced as a result of the failure to disclose that information.

Harmon was not prejudiced by the failure to disclose ███████████████████ in unrelated matters, both because (1) Harmon's counsel had ample opportunity to cast doubt on Ebyam's credibility of which Harmon's counsel took advantage, and (2) because there was extensive evidence of Harmon's guilt that was entirely independent of Ebyam's testimony. ██

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████ *Id.*

Similarly, in ███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[4] While the parties devote much of their argument to two out of circuit cases, *United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988), and *In re Sealed Case*, 185 F.3d 887 (D.C. Cir. 1999), neither case is apposite. *Presser* addressed only the government's obligation with respect to impeachment evidence of witnesses testifying favorably for the defendant. 844 F.3d at 1285. In *In re Sealed Case*, the court expressly declined to address whether impeachment evidence of a hostile defense witness must always be disclosed. 185 F.3d at 887, 893. Neither case squarely addresses whether the government is obligated to disclose impeachment evidence of a witness who is called by the defense but testifies as a hostile witness.

10

United States District Court
For the Northern District of California

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ██████████████████████████████ ███████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ████████████████████████████████████████

7 Here, ██████████████████████████████████ was not material for many

8 of the same two reasons presented in ███████████████. First, Harmon's counsel had ample

9 opportunity to cast doubt on Ebyam's credibility. Ebyam's credibility at trial was under substantial

10 attack by the defense on cross examination, and the most damaging impeachment material was

11 disclosed at trial. Notably, defense counsel crossed Ebyam about his criminal history, RT 1260:11-

12 23, and showed that Ebyam had been held in contempt as a result of lying to a judge at a bail

13 hearing in State court. RT 1298:5-1300:16. Defense counsel also devoted extensive cross

14 examination to Ebyam's obligation to cooperate with the government as part of a plea agreement.

15 RT 1261:18-25; 1264:20-25; 1270:15-19; 1272:8-10. Though Ebyam at first claimed that he did

16 not remember the terms of his plea agreement, defense counsel elicited testimony that Ebyam had

17 agreed to provide "substantial assistance to law enforcement authorities and otherwise compl[y]

18 fully with [the plea agreement]." RT 1266:24-1267:8. Defense counsel emphasized that it was in

19 the government's "sole and exclusive judgment" whether or not Ebyam had complied with that

20 agreement, *id.*, and underlined that if Ebyam failed to cooperate, the government would be released

21 from its promise not to prosecute Ebyam for any of the criminal acts to which he admitted as part

22 of his cooperation agreement. RT 1272:18-1273:3. Indeed, although the government did not

23 disclose the fact that ████████████████████████████████████,

24 Harmon's attorney elicited testimony from Ebyam that at the time of his arrest in 2003, Ebyam

25 cooperated with the government in prosecuting other individuals involved with SVR's operations.

26 RT 1295:23-1296:23. Under these circumstances, the Court concludes that the jury would have

27 gained little, if any, additional insight into ████████████████████████

28 ████████████████████████████ Even without that information, defense

11

United States District Court
For the Northern District of California

1   counsel was able to argue in closing that Ebyam was performing "tricks" on "command for the

2   government," and that there "would be consequences for not making the government happy." RT

3   1967:7-8; 1970:16-18. Defense counsel emphasized that both Ebyam and Pantages were

4   "convicted felons who are testifying subject to plea agreements who are going to go into prison if

5   they can't jump through hoops and roll over when the government asks them to[.]" RT 1979:5-11.

6   Defense counsel thus took various opportunities to portray Ebyam as an uncreditable witness who

7   was testifying in order to curry favor with the government, even without showing that Ebyam was

8   cooperating in other unrelated matters. Thus, as ██████████████████████████████████

9   ███████████████████████████████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████

11        Second, the Court finds that there was extensive evidence of Harmon's guilt that was

12  entirely independent of Ebyam's testimony. Thus, it is not the case, as Harmon argues, that "the

13  result of the trial would have been different if the jury had known of Ebyam's status." Mot'n at 6.

14  The Court notes that the Ninth Circuit held that there was "overwhelming evidence" of Harmon's

15  guilt. ECF No. 308 at 3. ████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████████████████████████████████

17  ██████    Notably, Pantages testified that he told Harmon all about the illicit nature of SVR, and

18  testified that Harmon proposed the scheme to funnel the checks through the client trust account

19  back to Pantages and Cortopassi. RT 930-973. Bank records, showing payments made at the times

20  and in the amounts Pantages testified, corroborated Pantages' testimony. RT 987, 991, 1001. The

21  Court further notes that in closing argument, the government devoted extensive time to showing

22  why the jury should believe Pantages' testimony over Harmon's. RT 1917-1928. In contrast,

23  Ebyam's testimony was mentioned by the government on only three occasions, each time briefly

24  and in conjunction with evidence from other witnesses. RT 1898:11-25; 1904:24-1905:4; 1916:7-

25  1917:2. The government presented a slide presentation during its closing argument, and on the

26  diagram arguing that the jury should conclude "Of Course Defendant Knew," none of the 12 bases

27  for Harmon's knowledge even refer to Ebyam's testimony. RT 1907; Opp'n Ex. A. Only 1 out of

28  the government's 70 slides relies on Yan Ebyam's testimony; in contrast, 19 slides are devoted to

12

United States District Court
For the Northern District of California

1  the question "How Do You Know Pantages Told the Truth" and 7 slides are devoted to "Why

2  Defendant is Not Credible" and "Why Defendant's Defense Makes No Sense." Opp'n Ex. A.[5]

3       In addition to Pantages' testimony, the government presented substantial evidence

4  corroborating Pantages' version of events. James Sibley testified that prior to the deposit of the

5  checks into the trust account, he had personally turned over discovery to Harmon showing that

6  SVR dealt in stolen goods. RT 563-567. Ingrid Cortapassi also confirmed the December meeting

7  between Pantages and Harmon at which Pantages transferred the checks to Harmon, and Cortapassi

8  testified that the whole purpose of depositing the TDC and Alta Tech checks was to hide them

9  from the government. RT 727-728. Ginger Wright provided additional circumstantial evidence,

10 showing that the pattern of depositing more than $100,000 in the client-trust account and then

11 disbursing it back to the client just weeks later was completely out of the norm for Harmon's legal

12 practice. RT 774-780. Wright also testified Harmon had never issued three checks in identical

13 amounts to a single client in just one day. RT 780. Wright also explained that the pattern of

14 depositing a sum of money substantially larger than the fixed fee agreed on by the client was

15 highly unusual for Harmon. RT 774-775.

16      Finally, although Harmon denied knowing about the true nature of SVR, on cross

17 examination Harmon admitted much of the circumstantial evidence on which the government

18 relied to prove her knowledge: she admitted that she had extensive experience with the criminal

19 justice system, that Pantages had been arrested with a large sum of money, that SVR's account had

20 been frozen, and that Pantages was in business with Ebyam, whom Harmon admitted she

21 understood to be a criminal. RT 1362, 1507, 1508-09, 1475-77. The Court concludes that ▮

22 given all the testimony and evidence cited above, the additional evidence that Ebyam was

23 cooperating with the DHS in 2008 "would not have added much, if anything," to Harmon's case.

24

25 [5] Harmon argues that "[Pantages] did not specifically testify that he told [Harmon] the checks she
   deposited into her trust account were the proceeds of illegal activity." Mot'n at 6 n. 2. This
26 argument is unpersuasive because while Pantages did not testify about the checks specifically,
   Harmon knew the TDC and Alta Tech checks were the result of SVR's business, and Pantages
27 testified that he told Harmon SVR had become "100 percent illegal" and that SVR was at the time
   engaged in "all illegal transactions." RT 932:4, 970:7.
28

13

1   ██████████████████████ (quoting *Belmontes v. Woodford*, 335 F.3d 1024, 2003 WL

2   21649351 (9th Cir. July 15, 2003)). Under these circumstances, the withheld information was not

3   material, and Harmon's *Brady* claim fails.

4   **V.     CONCLUSION**

5           For the foregoing reasons, the Court DENIES Harmon's motion for a new trial.

6   **IT IS SO ORDERED.**

7

8   Dated: August 27, 2014                                    _Lucy H. Koh_
                                                              _____
9                                                             LUCY H. KOH
                                                              United States District Judge

Case No.: 08-CR-00938-LHK
ORDER DENYING DEFENDANT JAMIE HARMON'S MOTION FOR A NEW TRIAL